UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

H & R BLOCK FINANCIAL ADVISORS,
INC.,

    Plaintiff, Counter-Defendant,

v.

EXPRESS SCRIPTS, INC.,

    Defendant, and

AMERICAN STOCK TRANSFER & TRUST
COMPANY,

    Defendant/Counter-Plaintiff;

and

AMERICAN STOCK TRANSFER & TRUST
COMPANY,

    Third-Party Plaintiff,

v.

CATHERINE B. SCHWARTZE,

    Third-Party Defendant.
    _____/

Case No.  05-73306

Honorable Nancy G. Edmunds

**ORDER GRANTING H & R BLOCK'S MOTION TO DISMISS [22]; DENYING H&R BLOCK'S MOTION FOR RULE 11 SANCTIONS [37]; and GRANTING IN PART AND DENYING IN PART AST'S MOTION FOR TURNOVER AND/OR MOTION TO DISMISS [20]**

    This dispute arises out of a surprise package that arrived at Catherine B. Schwartze's door in of June 2005.  It was a certificate entitling her to 150,000 shares of Express Scripts stock, worth over $7 million.  Schwartze, who had owned a small number or Express

Scripts shares several years ago but who was aware of no remaining shares in her portfolio, was no doubt surprised by the windfall. But when her broker was assured of the certificate's validity, she redeemed the stock and began investing it elsewhere. Predictably, however, the stock turned out to have been issued by mistake.

The parties are wrangling over who should suffer the losses incurred and reap the benefits generated by this transaction gone awry. Three Motions are now pending before the Court. For the reasons discussed below, the Court (1) GRANTS H&R Block Financial Advisors's Motion to Dismiss Counterclaim, (2) DENIES H&R Block Financial Advisors's Motion for Sanctions Under Rule 11, and (3) DENIES American Stock Transfer & Trust Company's Motion for Turnover of Express Scripts Stock and/or Motion to Dismiss.

**I.    Background**

The following facts do not appear to be in serious dispute. For a short period in 1992 and 1993, Third-Party Defendant Catherine B. Schwartze ("Schwartze") owned 100 shares of stock in Defendant Express Scripts, Inc. ("Express Scripts"), one of the nation's leading pharmacy benefit management companies. (Doc. 15 at 2.)

Defendant/Counter Plaintiff American Stock Transfer & Trust Co. ("AST") is Express Scripts's registered transfer agent, meaning that AST issues, exchanges, registers, and generally manages the transfer of Express Scripts stock. Apparently because of transactions in 1992 and 1993, AST retained Schwartze's personal information on its database.

In November 2003, Express Scripts directed AST to buy 150,000 shares of Express Scripts stock and to deposit it into Express Scripts's treasury account. AST collected the stock, but instead of depositing it into Express Scripts's account, a data processing error

prompted AST mistakenly to deposit the 150,000 shares into Schwartze's account. AST credited the shares only as a "book entry," and therefore issued no physical stock certificate to Schwartze. The error went undetected for almost two years.

Then, on June 29, 2005, Schwartze received a letter from George Paz, President and CEO of Express Scripts, informing Schwartze of the decision to declare a two-for-one split of Express Scripts stock, entitling shareholders to stock dividends in an amount equal to their previous stake in the company. Enclosed with the letter was a stock certificate issued by Express Scripts and AST representing 150,000 shares of Express Scripts stock.

Schwartze immediately took the certificate to her stockbroker, Plaintiff/Counter Defendant H & R Block Financial Advisors, Inc. ("HRBFA"). She asked HRBFA to sell all of the stock, despite having no reason to believe that she might rightfully own it.[1]

On June 29, the following telephone call took place between HRBFA ("Earl") and AST ("Diane"):

> Diane: Thank you for calling shareholder services my name is Diane Fisher. How may I help you today?
>
> Earl: Oh hi Diane my name is Earl Angmisner of Block Financial Advisors and I have a certificate of Express Scripts that I was try . . . I was wanting to check for stops or restrictions.
>
> Diane: Do you know if its Class A or B?
>
> Earl: It is let's see its just . . . they just has it as common actually here. I can give you the cusip if that helps ya.

---

[1]HRBFA makes the following vague allegation in a footnote to its Response to AST's Motion: "While AST repeatedly proclaims without any basis in fact that Schwartze 'knew' that she did not own any Express Scripts stock, it was speculated at one point that perhaps a now-deceased former boyfriend had bought the shares for her without letting her know." (Doc. 31 at 8.)

3

>  Diane:   Ok certificate number.
>
>  Earl:    A as in apple 8974 150,000 for Katherine Schwartze
>
>  Diane:   It's a good certificate.
>
>  Earl:    No stops or restrictions?
>
>  Diane:   No.
>
>  Earl:    Ok thank you very much.
>
>  Diane:   You're welcome.
>
>  Earl:    Bye bye.
>
>  Diane:   Bye bye.

(Doc. 33 at 5.)[2]

Subsequent to this telephone call, HRBFA began the process of selling Schwartze's shares. As Express Scripts's transfer agent, AST accepted and cancelled the stock certificate and reissued the 150,000 shares so that they could be traded on the market. When the sale was complete, HRBFA used the $7 million generated to purchase municipal bonds, which it deposited into Schwartze's investment account.

On July 13, 2005, Schwartze transferred $1.5 million out of her HRBFA account and into her account with another broker, Salomon Smith Barney.

Also on July 13, HRBFA surmised that since Schwartze received her 150,000-share surprise as the result of a two-for-one stock split, she must have previously owned 150,000 shares. HRBFA began looking for the other 150,000 shares. When HRBFA contacted AST, AST stated that Schwartze herself had inquired into the matter, and that AST was

---

[2]This transcript is copied verbatim from AST's Brief. AST has not provided an exhibit.

investigating the matter.  HRBFA followed up with AST several more times between from mid-July to mid-August, and even paid AST a $55 fee for the investigation.  On August 12, AST advised HRBFT that the research should be completed within a week or two.  (Doc. 37 Ex. 3.)

On August 19, 2005, Express Scripts notified AST that the 150,000 shares it had ordered deposited into its account in 2003 appeared to be missing.  AST then put the puzzle pieces together.

AST notified HRBFA of the problem on August 23.  At AST's request, HRBFA put a hold on Schwartze's investment account and requested that Salomon Smith Barney do the same.  On August 24, HRBFA explained the problem to Schwartze, liquidated the investment account, and repurchased 150,000 shares of Express Scripts stock in order to cover its potential liability to that company.  Because of the $1.5 million transferred out of Schwartze's account and because Express Scripts stock had increased in value, however, HRBFA now has an unsecured margin debit balance of more approximately $3 million.

On August 26, 2005, HRBFA filed this lawsuit against AST and Express Scripts. HRBFA alleges negligence, estoppel, and fraud.  Each of these counts focuses on AST's conduct; HRBFA seeks to impose liability on Express Scripts only as AST's principal. HRBFA seeks damages and fees,[3] essentially arguing that because it "requested and received assurances and promises from AST that the stock certificate was good, valid, and

---

[3]HRBFA's Complaint seeks a declaration that neither AST nor Express Scripts may receive 150,000 shares of Express Scripts from HRBFA, as well as compensatory damages, exemplary damages, and fees.  HRBFA appears to have since recognized, however, that it has no legal right to the 150,000 shares of Express Scripts stock, and has no basis upon which to seek a declaratory judgment affirming its ownership.

free and clear of any stop and/or restriction, and therefore, was transferable," and because it was "required to repurchase shares of Express Scripts and incur damages in excess of $3,000,000.00, in the form of an unsecured debit balance," AST and/or Express Scripts should be held liable for its potential losses.  (Doc. 3 at 2.)

On October 31, AST filed a third-party complaint against Schwartze (Doc. 15), as well as a Counterclaim against HRBFA.  (Doc. 13.)  Against HRBFA, AST pursues claims of statutory conversion, common law conversion, common law fraud/misrepresentation, negligence, recovery of payment by mistake, unjust enrichment, and civil conspiracy.  AST makes the following factual allegations:

> HRBFA knew that Schwartze had no right to and/or ownership interest in the stock certificate. . . .
>
> Moreover, . . . HRBFA failed to investigate whether Schwartze actually owned any shares, let alone 150,000 shares of Express Scripts stock (worth over $7 million), a necessary predicate to the issuance of an additional 150,000 shares, in her name, pursuant to a 2-for-1 stock split.  Indeed, it was unreasonable for HRBFA to believe that Schwartze would seek "advice and assistance" regarding the certificate from HRBFA if she already maintained 150,000 shares of Express Scripts . . . at another broker-dealer.
>
> Additionally, . . . HRBFA had no basis to believe that Schwartze had any right to and/or an ownership interest in the stock certificate given (a) the current value of her shareholder investment account at HRBFA and (b) her investment history with HRBFA. . . .
>
> The highly unusual nature of the presentation of the stock certificate by Schwartze should have raised immediate and significant red-flags at HRBFA.
>
> Notwithstanding these glaring red-flags, after receiving the certificate from Schwartze, HRBFA simply and only requested confirmation from AST that the certificate was validly issued by AST.  Moreover, when doing so, HRBFA failed to inform AST, and intentionally withheld from AST, the fact that Schwartze did not own any shares of Express Scripts common stock; that the certificate . . . was not transmitted by AST to HRBFA, but instead, was brought in by the customer off-the-street; that Schwartze was not and had never been a "high-end" customer/account; that Schwartze's investment

> history/activity in no way supported entitlement to or ownership of over $7 million in Express Scripts common stock; and that the facts surrounding the presentation of the certificate were highly unusual and suspicious. . . .
>
> HRBFA decided to immediately credit Schwartze's account with $7 million worth of shares, despite knowing, or recklessly disregarding the fact that she had no right to or ownership interest in the shares, in order to generate significant commissions for HRBFA. . . .

(Doc. 19 at 13-15.)

Now before the Court are three motions. HRBFA has filed a Rule 12(b)(6) Motion to Dismiss AST's counterclaim and a Motion for Sanctions under Rule 11, arguing that AST's counterclaim is patently frivolous. AST has filed a "Motion for Turnover of Express Scripts Stock and/or Motion to Dismiss," seeking the 150,000 shares of stock that HRBFA has already purchased to cover the 150,000-share mistake, and if HRBFA refuses to turn over the shares, dismissal of HRBFA's lawsuit.

## II.  HRBFA's Motion to Dismiss Counterclaim

### A.  Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a Complaint. In a light most favorable to Plaintiffs, the court must assume that Plaintiffs' factual allegations are true and determine whether the Complaint states a valid claim for relief. *See Albright v. Oliver*, 510 U.S. 266 (1994); *Bower v. Federal Express Corp.*, 96 F.3d 200, 203 (6th Cir. 1996); *Forest v. United States Postal Serv.*, 97 F.3d 137, 139 (6th Cir. 1996). This standard of review "'requires more than the bare assertion of legal conclusions.'" *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir. 1997) (quoting *Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995)). The Complaint must include direct or indirect allegations "respecting all the material

elements to sustain a recovery under *some* viable legal theory." *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993) (citations omitted) (emphasis in original).

**B. Discussion**

Article 8 of the Uniform Commercial Code, adopted in Michigan, governs this case. It provides that a "securities intermediary" includes a "person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity." Mich. Comp. L. § 440.8102(n)(ii). HRBFA is therefore a securities intermediary.

HRBFA points out that "one of the fundamental principles of the Article 8 indirect holding system" is that as a securities intermediary, it "owes duties only to its entitlement holders." (Doc. 22 at 7-8 (quoting Mich. Comp. L. § 440.8115 cmt 4).) HRBFA is correct, but this "fundamental principle" is irrelevant to this case. Here, the challenged conduct took place *before* Schwartze became an "entitlement holder." HRBFA's own Brief makes this point perfectly clear: "*Once* Schwartze's HRBFA account was credited with the 150,000 shares, she *became* an 'entitlement holder,' which is 'a person identified in the records of a securities intermediary as the person having security entitlement against the securities intermediary.'" (*Id.* at 5 (quoting Mich. Comp. L. § 440.8102(g)) (emphasis added).) Thus, by HRBFA's own admission, Schwartze was not in fact an entitlement holder at the time of HRBFA's alleged misconduct.

HRBFA also relies primarily on Section 115 of Article 8, which provides,

> A securities intermediary that has transferred a financial asset pursuant to an effective entitlement order, or a broker or other agent or bailee that has dealt with a financial asset at the direction of its customer or principal, is not liable to a person having an adverse claim to the financial asset, unless the

>   securities intermediary, or broker or other agent or bailee did 1 or more of the following:
>
>   . . .
>
>   (b) Acted in collusion with the wrongdoer in violating the rights of the adverse claimant.
>
>   (c) In the case of a security certificate that has been stolen, acted with notice of the adverse claim.

Mich. Comp. L. § 440.8115.

AST contends that this statute does not apply. Because HRBFA is not "a securities intermediary that has transferred a financial asset pursuant to an effective entitlement order," AST argues, the entitlement order was not "effective." Very few cases directly address this precise issue, but in *Powers v. Am. Express Financial Advisors, Inc.*, 82 F. Supp. 2d 448 (D. Md. 2000) (*aff'd*, 2000 U.S. App. LEXIS 31241 (4th Cir. 2000)), the court was faced with an analogous question. Two lovers held a joint account with a securities intermediary. The investment contract required that the signatures of both must appear on any redemption request of over $50,000. When the relationship went sour, and one of the lovers forged the other's signature and emptied their joint account, the securities intermediary honored the request. The court imposed a sort of strict liability, holding that while the intermediary was ignorant of the true facts and innocent of wrongdoing, the forged redemption request was not "an effective entitlement order" because it was legally deficient. *Id.* at 452-56. Because this reasoning applies with equal force to the present case, it certainly supports AST's argument. But AST overlooks the fact that Section 115 defines two distinct classes of people. In addition to those acting at the behest of an "effective entitlement order," it protects "a broker or other agent or bailee that has dealt with a

financial asset at the direction of its customer or principal." Mich. Comp. L. § 440.8115. The latter definition unquestionably accounts for HRBFA.

AST next contends that it has alleged facts sufficient to support either of the above two exceptions to Section 115. As to exception (c), AST spends pages trying to establish the "acted with notice of the adverse claim" element (Doc. 33 at 14-17), but fails even to mention the word "stolen" in its argument.[4] "Steal" is defined in part as the "taking and carrying away of the personal property of another," *Black's Law Dictionary* 1413 (6th Ed. 1990), a definition that cannot aptly be used to describe the facts of this case. To be sure, ASL alleges "conversion" on the part of Schwartze, but that does not suffice. "Probably every stealing is a conversion, but certainly not every knowing conversion is a stealing. 'To steal means to *take away from one* in lawful possession . . . .'" *Morissette v. U.S.*, 342 U.S. 246, 271 (1952) (quoting *Irving Trust Co. v. Leff*, 171 N.E. 569, 571 (N.Y. 1930)) (emphasis added by *Morissette* court). Here, because no security certificate has been "stolen," HRBFA's notice of any adverse claim is irrelevant.[5]

---

[4]The word appears out of context in an uncited quote in a footnote. (Doc. 33 at 15 n.10.)

[5]AST argues this issue in its Response to HRBFA's Motion for Rule 11 Sanctions, citing a number of cases that give a broader definition to "steal" and "stolen." Of particular importance to AST's argument is *United States v. Turley*, 352 U.S. 407 (1957), in which the Court stated that "the term was never at common law equated or exclusively dedicated to larceny." *Id.* at 411-12. Nevertheless, the Court adopted a definition of stolen that included "the criminal taking of personal property either by larceny, embezzlement, or false pretenses." *Id.* at 412 (citation omitted). Importantly, AST's definitions of stolen all require a wrongful *taking*, which is simply not present in this case.

The more difficult issue for the Court is whether HRBFA acted in collusion with Schwartze, and therefore is subject to exception (b) to Section 115. Comment 5 describes in detail the showing necessary to hold HRBFA liable:

> Knowledge that the action of the customer is wrongful is a necessary but not sufficient condition of the collusion test. The aspect of the role of securities intermediaries and brokers that Article 8 deals with is the clerical or ministerial role of implementing and recording the securities transactions that their customers conduct. Faithful performance of this role consists of following the instructions of the customer. It is not the role of the record-keeper to police whether the transactions recorded are appropriate, so mere awareness that a customer may be acting wrongfully does not itself constitute collusion. That, of course, does not insulate an intermediary or broker from responsibility in egregious cases where its action goes beyond the ordinary standards of the business of implementing and recording transactions, and reaches a level of affirmative misconduct in assisting the customer in the commission of a wrong.

Mich. Comp. L. § 440.8115 cmt. 5.

AST alleges in its Counterclaim that HRBFA "had no basis to believe that Schwartze had any right to and/or an ownership interest in the stock certificate," ignored and failed to inform AST of "glaring red-flags," and credited Schwartze's account "despite knowing, or recklessly disregarding the fact that she had no right to or ownership interest in the shares." (Doc. 19 at 13-15.) AST now describes HRBFA's conduct in similar terms:

> [T]he facts available to HRBFA could only give rise to one reasonable conclusion: i.e., that the certificate had been mistakenly issued. . . . [F]earing that its clear suspicion/knowledge would be confirmed, and with dollar signs dancing in its head, HRBFA . . . telephone[d] AST[] . . . and ask[ed] a calculated, limited inquiry: whether any "stops or restrictions" existed with respect to the certificate. In fact, HRBFA intentionally limited its inquiry in this regard suppressing both the existence of glaring red flags and its clear suspicion/knowledge that Schwartze had no interest in the shares, presumably to give the false impression that nothing unusual existed.

(Doc. 33 at 5.)

With this language, AST attempts to turn a negative into a positive.  It argues that HRBFA's *failure to apprise* it of "red flags" constituted *affirmative* misrepresentation--that HRBFA contacted AST not to ensure the validity of the stock certificate, as the transcript would suggest, but rather as a slick means of lulling AST into complacency--"so that AST would not conduct its own investigation and uncover its own negligent error." (Doc. 43 at 4.)

This argument, while clever, is unpersuasive.  It was not HRBFA's job "to police whether the transactions recorded are appropriate." Mich. Comp. L. § 440.8115 cmt. 5.  And because its conduct was, at best, merely passive, it did not "reach[] a level of affirmative misconduct in assisting the customer in the commission of a wrong." *Id.*

Even assuming AST's allegations to be true, HRBFA's conduct in this case is protected by Section 115 of the Uniform Commercial Code as adopted in Michigan.  The Court need not address whether AST has otherwise stated a viable claim against HRBFA.  For the reasons discussed above, the Court GRANTS HRBFA's Motion to Dismiss AST's Counterclaim.

### III.  HRBFA's Motion for Rule 11 Sanctions

Federal Rule of Civil Procedure 11 provides in part,

> (b) Representations to Court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,--
>
> > (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
>
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.
>
> (c) Sanctions. If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

While the Court finds AST's arguments against HRBFA to be unpersuasive, Rule 11 sanctions are not appropriate. As the Court stated during oral argument, HRBFA has not worn a white hat in this transaction, and if not for the above interpretation of Section 115, its conduct might subject it to liability. Accordingly, the Court DENIES HRBFA's Motion for Rule 11 Sanctions.

## IV.  AST's Motion for Turnover and/or Motion to Dismiss

After learning that Catherine Schwartze's 150,000 shares of Express Scripts stock did not in fact belong to her, HRBFA immediately purchased "cover" on the market--it liquidated Schwartze's account and used the funds to buy back Express Scripts. HRBFA determined that it was bound to do so by Securities and Exchange Commission regulations, which provide,

> A registered transfer agent, in the event of any actual physical overissuance that such transfer agent caused and of which it has knowledge, shall, within 60 days of the discovery of such overissuance, buy in securities

13

> equal to the number of shares in the case of equity securities or the principal dollar amount in the case of debt securities. . . . This paragraph requires a buy-in only by the transfer agent that erroneously issued the certificate(s) giving rise to the physical overissuance . . . .

17 C.F.R. § 240.17Ad-10(g)(1).

AST, on the other hand, chose not to purchase its own set of 150,000 shares. HRBFA contends that AST's decision must have been based on its incorrect assumption that Express Scripts would decrease in value. But more likely, AST simply recognized that two sets of cover stock were unnecessary, and that since HRBFA had access to Schwartze's account (and most of the capital necessary for a 150,000-share purchase), HRBFA was in the better position to make the cover purchase.

AST now moves for the turnover of the 150,000 shares now in HRBFA's possession. AST has no legal authority, but makes a compelling argument based on simple common sense, and based on the fact that Express Scripts stock has continued to increased in value significantly since HRBFA purchased the 150,000 shares. As AST points out,

> Express Scripts . . . can no longer wait for its account to be placed in balance. If AST is obliged . . . to repurchase a second set of 150,000 shares . . . , AST will be forced to repurchase the shares at a price that is significantly higher than that paid by HRBFA when it initially covered approximately three months ago . . . .

(Doc. 20 at 7.)

Obviously, Express Scripts needs only one set of 150,000 shares to put its books in balance, and it would make very little sense to force AST to purchase a second set of shares. Moreover, it would be unnecessary and unfair to allow HRBFA to keep a windfall profit because the capital it invested in Express Scripts was not its own, and because it invested in Express Scripts only because of its perceived legal duty to do so.

14

AST proposes that it be allowed to post bond in the amount of its potential liability to HRBFA--approximately $3 million--which would protect HRBFA from any losses. The Court is satisfied that this is a fair and reasonable solution to the dilemma now facing these parties. The 150,000 shares of Express Scripts stock now in HRBFA's possession are intended to balance Express Scripts's books, and that is exactly how they should be used.

The Court therefore GRANTS IN PART and DENIES IN PART AST's Motion for Turnover of Express Scripts Stock and/or Motion to Dismiss and ORDERS as follows: Upon AST's posting of adequate bond to cover HRBFA's potential losses, HRBFA must turn over 150,000 shares of Express Scripts stock to AST. AST may post bond in an escrow account without prejudice to seek recoupment if HRBFA is found not liable.


                                                 s/Nancy G. Edmunds
                                                 Nancy G. Edmunds
                                                 United States District Judge

Dated: April 6, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 6, 2006, by electronic and/or ordinary mail.

                                               s/Carol A. Hemeyer
                                               Case Manager